## S10A1004. FOSTER v. THE STATE.

(701 SE2d 189)

HINES, Justice.

Robert Dwight Foster appeals his convictions for malice murder, aggravated assault, burglary, and criminal damage to property in the second degree, in connection with the death of Tacara Judon and the injury of Ronald Porter. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Foster and Octavia Robinson (formerly Octavia Judon) were involved in a romantic relationship. Robinson ended the relationship in July 2003 because Foster was jealous and possessive. The pair reestablished contact in January 2004, but did not date again.

On February 6, 2004, Robinson turned down Foster's request for a date and said that she had plans. Robinson and her friend Kwantez Dennis spent some time that evening with Robinson's two children, daughter Tacara Judon, aged five, and son Ronald Porter, aged ten.

---

[1] The crimes occurred on February 6 or 7, 2004. On October 6, 2004, a Clayton County grand jury indicted Foster for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of burglary, the aggravated assault of Tacara Judon with the intent to murder her, the aggravated assault of Tacara Judon with a deadly weapon, the aggravated assault of Ronald Porter with the intent to murder him, the aggravated assault of Ronald Porter with a deadly weapon, burglary, and criminal damage to property in the second degree. On November 1, 2004, the State filed a notice of its intent to seek the death penalty. Foster was tried August 20-26, 2007, and was found guilty on all counts. On August 27, 2007, Foster was sentenced to life in prison without the possibility of parole for the malice murder, separate terms of twenty years in prison for the aggravated assault of Ronald Porter with the intent to murder him and the burglary, and five years for criminal damage to property in the second degree, all to be served consecutively to the life term and to each other; the remaining convictions were either merged into other crimes or stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Foster moved for a new trial on August 29, 2007, and amended the motion on August 19, 2008. The motion was denied on May 28, 2009, and Foster filed a notice of appeal on June 29, 2009. His appeal was docketed in this Court for the April 2010 term, and argued on June 14, 2010.

Foster telephoned Robinson during dinner and she told him she would return his call. Robinson and Dennis later left the children at home alone while they went to a nearby movie theater to see if there were enough seats for the four to see a movie; at the time they left, the children were asleep. Shortly after midnight, while Dennis was inside the theater, Robinson received a phone call from Foster that originated from her home phone. Foster was angry that Robinson was not with him and, in a profanity-laced tirade, said that he had damaged her garage, Dennis's truck, and her bedroom; he then said "your kids are home and they're going to die."

Robinson rushed home in her car and found that Dennis's vehicle had been rammed through a garage door of the house; the front door to the house was open. She went to Ronald's room; he was lying on the floor severely beaten. Robinson went to Tacara's room; she was lying in a pool of blood in her bed, beaten, and had no pulse. Tacara died of multiple blunt force trauma injuries to the head; her death was not instantaneous. Ronald suffered similar injuries resulting in brain damage that required extensive hospitalization, surgery, and physical rehabilitation; he remains deaf in one ear. He also suffered a broken hand and other defensive injuries during the attack.

When police officers arrived at Robinson's residence, they found the mailbox knocked over, and a cordless telephone from the house attached to it. A bloody tire lug wrench was lying on the kitchen floor, the picture tube of the television in the master bedroom was broken, and blood was on the 9 and 1 keys of the telephone. A second garage door, next to the one rammed by Dennis's truck, had also been broken inwards.

Very early on February 7, 2004, law enforcement personnel received a 911 call from Foster; he identified himself, said he was at Robinson's address, reported that he had just tried to kill two children with a tire lug wrench he had taken from his car, and asked the police to come for him as he waited around the corner. He was found in his car; it had extensive front-end damage, his boots were bloodstained, and there was blood on one of his hands. At trial, the parties stipulated that the DNA from the blood on the tire lug wrench and Foster's boots matched Ronald Porter's blood, and potentially matched that of Tacara Judon.

When interviewed by detectives, Foster initially asked for an attorney, and the detectives said the interview would end, and began to leave. Foster stopped them and asked how the children were doing; he was told that the girl had died and that the boy was badly injured. Foster asked what he was going to be charged with and the detectives told him murder. After a brief conversation, Foster stated "most people don't kill kids, most people don't do that," and he was certain the State would request that the death penalty be imposed.

The State sought the death penalty, and after his convictions, Foster was sentenced to life without the possibility of parole for the malice murder charge.

1. Foster contends that the evidence was insufficient to convict him of malice murder and aggravated assault as the indictment alleged that those crimes were committed on February 6, 2004, when the evidence did not establish that the crimes took place on that date, but rather after midnight and during the early moments of February 7, 2004. "The State is not required to prove beyond a reasonable doubt that the crimes occurred on the date alleged in the indictment where, as here the indictment does not specifically state that the date of the offense is material." (Citation and punctuation omitted.) *Waits v. State*, 282 Ga. 1, 3 (2) (644 SE2d 127) (2007).

Foster also asserts that the evidence was insufficient to convict him of the crime of burglary because the State failed to prove that he entered or remained in Robinson's house with the intent to commit a felony therein.[2] However, intent "may be inferred from conduct before, during and after the commission of the crime." *Parks v. State*, 272 Ga. 353, 354 (529 SE2d 127) (2000). Foster committed physical violence both outside and inside the house, entered it armed with a tire lug wrench he had taken from his car, and telephoned Robinson from her residence to tell her that her children were "going to die." The evidence was sufficient to enable a rational trier of fact to find Foster guilty beyond a reasonable doubt of burglary, as well as all of the other crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Foster raises a variety of issues regarding the composition of the grand and traverse juries in his case.

(a) In multiple enumerations of error, Foster challenges the grand and traverse jury source lists, raising the same arguments regarding Clayton County lists that this Court rejected in *Williams v. State*, 287 Ga. 735 (699 SE2d 25) (2010). In that case, this Court reiterated that the most-recently-available Decennial Census is the proper benchmark to use in determining if a fair cross-section of the

---

[2] As set forth in OCGA § 16-7-1 (a),

[a] person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another or enters or remains within any other building, railroad car, aircraft, or any room or any part thereof. A person convicted of the offense of burglary, for the first such offense, shall be punished by imprisonment for not less than one nor more than 20 years. For the purposes of this Code section, the term "railroad car" shall also include trailers on flatcars, containers on flatcars, trailers on railroad property, or containers on railroad property.

County's eligible jurors have been selected for jury lists. Id. Accordingly, these arguments have no merit.

(b) Foster asserts that the traverse jury source list was compiled by a board of jury commissioners that was comprised of only five members, rather than six members as directed by OCGA § 15-12-20.[3] However, this circumstance does not rise to "such disregard of the essential and substantial provisions of the statute as would vitiate the arrays." (Citation and punctuation omitted.) *Pope v. State*, 256 Ga. 195, 197 (1) (c) (345 SE2d 831) (1986), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999). See also *Sealey v. State*, 277 Ga. 617, 619 (2) (593 SE2d 335) (2004). To the extent that Foster argues that the failure to have the commission composed of six members as called for by OCGA § 15-12-20 constitutes a violation of the Sixth or Fourteenth Amendments, he fails to show that the five-member jury commission established a jury source list that did not represent a fair cross-section of the community, or that the list was the product of intentional discrimination. See generally *Al-Amin v. State*, 278 Ga. 74, 80 (7) (597 SE2d 332) (2004).

(c) When the 2005 traverse jury source list was compiled, it included a customer list of the county water authority, and some persons serviced by the authority reside outside the county. Foster contends that the 2007 traverse jury list applicable to his trial thus may have included persons who were not residents of Clayton County. However, the water authority list was used only for the 2005 source list, and Foster produced no evidence that showed that any

---

[3] OCGA § 15-12-20 reads:

(a) In each county there shall be a board of jury commissioners, whose members shall be discreet persons who are not practicing attorneys at law nor county officers, who shall be appointed by the chief judge of the superior court.

(b) Absent promulgation of a court rule pursuant to subsection (c) of this Code section specifying a lesser number, the board of jury commissioners shall be composed of six members. When the board is composed of six members, on the first appointment two shall be appointed for two years, two for four years, and two for six years. Their successors shall be appointed for a term of six years.

(c) In any county the chief judge of the superior court may establish by court rule duly published and filed a board of jury commissioners composed of not less than three nor more than five members. In counties in which the numerical composition of the board has been established by court rule, the first appointments to the board shall be fixed in such a manner that not more than one member's term shall expire during any calendar year. The chief judge shall adjust the composition and terms of members of the board in office at the time of the publication of the court rule. Successors to members of the board originally appointed under the provisions of a court rule shall be appointed for a term of six years.

(d) In all cases, the chief judge shall have the right to remove the jury commissioners at any time, in his discretion, for cause and appoint successors. However, no person who has served for more than three years as a jury commissioner shall be eligible or shall be appointed to succeed himself as a member of the board of jury commissioners.

non-resident of Clayton County appeared on the 2007 traverse jury list.

(d) Foster contends that Hispanic persons were misrepresented in the composition of the grand and traverse jury pools, in violation of the Sixth and Fourteenth Amendments, and OCGA § 15-12-40.[4] The

---

[4] OCGA § 15-12-40 reads:

(a) *Nonmechanical procedure.*

(1) At least biennially, unless otherwise directed by the chief judge of the superior court, the board of jury commissioners shall compile, maintain, and revise a trial jury list of upright and intelligent citizens of the county to serve as trial jurors and a grand jury list of the most experienced, intelligent, and upright citizens of the county to serve as grand jurors. In composing the trial jury list, the board of jury commissioners shall select a fairly representative cross section of the intelligent and upright citizens of the county. In composing the grand jury list, the board of jury commissioners shall select a fairly representative cross section of the most experienced, intelligent, and upright citizens of the county. In carrying out revisions of the trial jury list and grand jury list on or after July 1, 2002, the board of jury commissioners shall make use of all of the following:

(A) A list of all residents of the county who are the holders of drivers' licenses or personal identification cards issued by the Department of Driver Services pursuant to the provisions of Chapter 5 of Title 40; and the Department of Driver Services shall periodically make such a list available to the board of jury commissioners of each county;

(B) The registered voters list in the county; and

(C) Any other list of persons resident in the county as may be deemed appropriate by the board of jury commissioners.

The Department of Driver Services shall provide a list, which includes the name, address, date of birth, gender, driver's license or personal identification card number issued pursuant to the provisions of Chapter 5 of Title 40, and, whenever racial and ethnic information is collected by the Department of Driver Services for purposes of voter registration pursuant to Code Section 21-2-221, racial and ethnic information, to the board of jury commissioners of each county. No jury list compiled prior to July 1, 2002, shall be rendered invalid by the use of or a failure to make use of the sources specified in this Code section; but each revision of the jury list on or after that date shall make use of all such sources to the extent actually available to the board of jury commissioners.

(2) The grand jury list shall not exceed two-fifths of the number of citizens on the county's most recent trial jury list.

(3) Once filed, the lists so created shall constitute the body of trial and grand jurors for the county, respectively. Except as otherwise provided in this article, no new names shall be added to either list until those names originally selected have been completely exhausted or until a revised list has been properly created.

(b) *Mechanical or electronic procedure.*

(1) In any county using a plan for the selection of persons to serve as jurors by mechanical or electronic means in conformance with paragraphs (1) and (2) of subsection (b) of Code Section 15-12-42, the board of jury commissioners shall compile and maintain a trial jury list and a grand jury list in conformance with paragraph (1) of subsection (a) of this Code section.

(2) Once the trial or grand jury lists, or both, are established, the board of jury commissioners may revise such lists from time to time by

standards for proving a prima facie jury pool composition violation are virtually identical under the Sixth and Fourteenth Amendments. *Morrow v. State*, 272 Ga. 691, 693 (1) (532 SE2d 78) (2000).

To prevail on a Sixth Amendment jury pool composition challenge, [Foster] must show: (1) that the group alleged to

---

adding new names to the lists, correcting names and other data on the lists, and deleting names from the lists by reason of death or other legal cause.

(3) The trial jury box for the county shall be taken from the trial jury list established by the board of jury commissioners, and the grand jury box for the county shall be taken from the grand jury list established by the board of jury commissioners. The information contained in the trial and grand jury boxes shall be stored in a security data processing storage bank from which all trial or grand juries in the county shall be selected as provided in the plan adopted by the court pursuant to Code Section 15-12-42.

(4) The number of citizens in the grand jury box shall be established by the board of jury commissioners but shall contain, as a minimum, a number equal to four times the number of grand jurors required to be drawn in the county annually, but not to exceed 5,000 grand jurors.

(5) At each selection of trial or grand jurors, the computer shall be programmed to scan the entire appropriate jury box under the formula and plan adopted by the court pursuant to Code Section 15-12-42.

(6) In any county utilizing a plan for the selection of persons for the trial and grand jury boxes by mechanical or electronic means in conformance with paragraph (4) of subsection (b) of Code Section 15-12-42, the trial or grand jury box for the county may be compiled from the trial or grand jury list of the county by mechanical or electronic means as provided for in the plan.

(c) *Other disposition or transfer.* In any county in which more than 70 percent of the population of the county according to the United States decennial census of 1980 or any future such census resides on property of the United States government which is exempt from taxation by this state, the population of the county for the purpose of this Code section shall be deemed to be the total population of the county minus the population of the county which resides on property of the United States government other than persons who reside on property of the United States government within such county who are registered voters according to the official registered voters list of the county as most recently revised by the county board of registrars or other county election officials and any persons who reside on property of the United States government within such county who are not registered voters and who have requested in writing to the board of jury commissioners that their names be included on the list from which citizens are selected to serve as jurors and grand jurors by the board of jury commissioners.

(d) *Assistance of the Administrative Office of the Courts.*

(1) The Administrative Office of the Courts may assist the clerk of the superior court or the jury clerk, whichever is applicable, by providing a list of county citizens who the Administrative Office of the Courts certifies are prima facie eligible persons for consideration as jurors on the traverse and grand jury pools.

(2) The Department of Driver Services shall provide the Administrative Office of the Courts the list required by subparagraph (a) (1) (A) of this Code section and the information set forth in the undesignated text of paragraph (1) of subsection (a) of this Code section.

(3) The Secretary of State shall provide the Administrative Office of the Courts the list of registered voters and list of convicted felons.

be excluded is a "distinctive" group in the community; (2) that the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. [Cits.] To prevail on a Fourteenth Amendment challenge to the composition of a jury pool, [Foster] must show: (1) the group is one that is a recognizable, distinct class; (2) the degree of underrepresentation, by comparing the proportion of the group in the total population to the proportion called to serve as jurors over a significant period of time; and (3) a selection procedure that is susceptible of abuse or is not racially neutral which supports a presumption of discrimination raised by the statistics. [Cits.]

Id. at 692 (1).

After a pre-trial hearing, the trial court ruled that Hispanic persons in Clayton County were not a cognizable group for grand and traverse jury purposes under the Sixth Amendment. The trial court did not alter that determination in its ruling on Foster's motion for a new trial, as amended. However, we need not address this issue as Foster failed to show any actual misrepresentation of this group. See *Humphreys v. State*, 287 Ga. 63, 68 (3) (b) (694 SE2d 316) (2010).

Foster's own expert witness testified that when using 2000 Census data,[5] absolute disparity figures for Hispanics were under the five percent threshold, although when adjusted to account for the citizenship rate of Hispanic persons, the absolute disparity figure showed over-representation by 6.12 percent for the grand jury list.[6] Thus, the absolute disparity figures were "well within constitutional requirements. See *Cook v. State*, 255 Ga. 565, 571 (11) (340 SE2d 843) (1986) (holding that, in general, absolute disparities under ten percent satisfy constitutional requirements)." *Humphreys*, supra at 69 (3) (b) (i). The failure to show any such misrepresentation is also fatal to Foster's claim under OCGA § 15-12-40. See *Rice v. State*, 281 Ga. 149 (1) (635 SE2d 707) (2006).

(e) Foster also contends that the jury commission engaged in improper forced balancing to achieve representation of racial groups in the grand and traverse jury pools. "Forced balancing to ensure

---

[5] Foster also presented data and calculations based upon 2005 and 2007 Census estimates, but as this Court recently reaffirmed, the Decennial Census is the proper benchmark to use in determining proper representation. *Williams*, supra at 738 (2).

[6] The expert witness's testimony was that the absolute disparity figure for the grand jury list without adjusting for citizenship status showed 1.53% over-representation; for the traverse jury list, the absolute disparity figure was 2.17% under-representation without adjusting for citizenship status, and 2.42% over-representation with the adjustment.

that the racial balance in a grand or traverse jury pool reflects the racial balance in the county population is not unconstitutional. *Gissendaner v. State*, 272 Ga. 704 (5) (532 SE2d 677) (2000)." *Yates v. State*, 274 Ga. 312, 317 (5) (553 SE2d 563) (2001).

(f) According to Foster, the grand jury and traverse jury certificates did not reflect the correct 2000 Census figures. However, the evidence of his expert upon which he relies showed that the differences between data used by the expert and that of the jury commission was due to the different manner in which the expert treated Hispanic persons. And, again, Foster fails to show any unconstitutional under-representation or over-representation of any cognizable group, even using what he contends are the correct figures. *Humphreys*, supra at 69 (3) (b) (ii).

3. During jury voir dire, Foster was not permitted to ask prospective jurors whether they considered law enforcement officers more or less trustworthy than other persons. "It is not error to refuse to allow defense counsel to ask whether a prospective juror would tend to believe or prefer the testimony of a police officer over other testimony." (Citations and punctuation omitted.) *Simmons v. State*, 282 Ga. 183, 187 (9) (646 SE2d 55) (2007).

4. Foster requested that the jury be instructed on the law regarding voluntary manslaughter as a lesser included offense of malice murder, but the trial court did not give the charge. See OCGA § 16-5-2 (a).[7] "It is a question of law whether there is any evidence to support a finding that the defendant acted 'solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . .' OCGA § 16-5-2 (a). [Cit.]" *Paul v. State*, 274 Ga. 601, 605 (3) (b) (555 SE2d 716) (2001). He urges that sexual jealousy on his part constituted provocation sufficient to authorize the jury instruction. See *Goforth v. State*, 271 Ga. 700, 701 (1) (523 SE2d 868) (1999); *Williams v. State*, 245 Ga. App. 670, 671 (1) (538 SE2d 544 ) (2000). His argument hinges upon the assertion that the provocation involved may come from a person different from the one upon whom the defendant has purposefully directed fatal violence. Compare *McLendon v. State*, 172 Ga. 267 (4) (157 SE 475) (1931) (instruction

---

[7] OCGA § 16-5-2 (a) reads:

A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

on voluntary manslaughter required when the offense would be voluntary manslaughter if the intended target had died, and instead a third party is killed); *Coker v. State*, 209 Ga. App. 142 (433 SE2d 637) (1993) (crime was voluntary manslaughter when shooting was done in circumstances that would be voluntary manslaughter and defendant killed a bystander). Assuming arguendo that this assertion is correct, but see *Foster v. State*, 264 Ga. 369, n. 2 (444 SE2d 296) (1994), we agree with the court's ruling at trial that Robinson's statement that she was out with another man was not "sufficient to excite sudden, violent, and irresistible passion in a reasonable person, OCGA § 16-5-2." *Mayweather v. State*, 254 Ga. 660, 661 (3) (333 SE2d 597) (1985).

5. During the conference on the presentation of the sentencing phase, Foster objected to the State's request for a jury instruction regarding the statutory aggravating circumstance of aggravated battery because no such crime was set forth in the indictment. But, while an aggravating circumstance must be proved to the jury, it need not be included in the indictment. *Jones v. State*, 282 Ga. 784, 790-791 (2) (653 SE2d 456) (2007). To the extent that Foster's objection raised an issue of the State's notice of its intent to rely upon this aggravating circumstance, the State informed Foster of its intent to seek the death penalty on November 1, 2004, and separately gave written notice of five statutory aggravating circumstances, including aggravated battery.[8] It is not constitutionally required that aggravating circumstances be included in the indictment; other means of giving written notice of the aggravating factors which the State intends to rely upon may be employed, such as those used here. *Terrell v. State*, 276 Ga. 34, 41 (5) (572 SE2d 595) (2002). See also *Walker v. State*, 281 Ga. 157, 160 (2) (635 SE2d 740) (2006).

6. Foster urges that, during the sentencing phase of the trial, the court abused its discretion in allowing oral, rather than written or read, victim impact statements from the family of the murder victim. While this Court has noted with approval the reading of prepared statements by victim impact witnesses, *Turner v. State*, 268 Ga. 213,

---

[8] The notice cited OCGA §§ 17-10-2 and 17-10-30, and declared that the State would rely upon the following statutory aggravating circumstances:

1) The offense of murder was committed by the Defendant while he was engaged in the commission of aggravated battery.

2) The offense of murder was committed by the Defendant while he was engaged in the commission of burglary.

3) The offense of murder committed by the Defendant was outrageously and wantonly vile, horrible and inhuman in that it involved torture.

4) The offense of murder committed by the Defendant was outrageously and wantonly vile, horrible and inhuman in that it involved depravity of mind.

5) The offense of murder committed by the Defendant was outrageously and wantonly vile, horrible and inhuman in that it involved aggravated battery.

214-215 (2) (a) (486 SE2d 839) (1997), the fact that such a procedure is not followed does not mean that "this omission resulted in the admission of unlawfully prejudicial testimony and/or courtroom demeanor that the recommended procedure was designed to avoid. [Cit.]" *Lance v. State*, 275 Ga. 11, 24 (27) (560 SE2d 663) (2002).

Foster contends that in this instance, unlawfully prejudicial evidence was admitted through the testimony of Tacara's father that, since the crimes, he had suffered depression, nightmares, had trouble sleeping, and had seen a psychiatrist, and the testimony of Tacara's mother that her sadness, crying, and being in a "dazed state" had spurred her to visit a psychologist for three months and a counselor for six months. However, we do not agree; the relevant statute specifically provides for the admission of evidence of "any request for psychological services initiated by the victim or the victim's family as a result of the offense [and] other information related to the impact of the offense upon the victim [or] the victim's family . . . ." OCGA § 17-10-1.2 (b) (5), (6).[9]

---

[9]  OCGA § 17-10-1.2 reads:

(a) (1) In all cases in which the death penalty may be imposed, subsequent to an adjudication of guilt and in conjunction with the procedures in Code Section 17-10-30, the court shall allow evidence from the family of the victim, or such other witness having personal knowledge of the victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, or the community. Except as provided in paragraph (4) of this subsection, such evidence shall be given in the presence of the defendant and of the jury and shall be subject to cross-examination.

(2) The admissibility of the evidence described in paragraph (1) of this subsection and the number of witnesses other than immediate family who may testify shall be in the sole discretion of the judge and in any event shall be permitted only in such a manner and to such a degree as not to inflame or unduly prejudice the jury. As used in this paragraph, the term "immediate family" means the victim's spouse, child, parent, stepparent, grandparent, grandchild, sibling, stepbrother, stepsister, mother-in-law, father-in-law, sister-in-law, or brother-in-law and the spouses of any such individuals.

(3) In all cases other than those in which the death penalty may be imposed, prior to fixing of the sentence as provided for in Code Section 17-10-1 or the imposing of life imprisonment as mandated by law, and before rendering the appropriate sentence, including any order of restitution, the court shall allow evidence from the victim, the family of the victim, or such other witness having personal knowledge of the impact of the crime on the victim, the family of the victim, or the community. Except as provided in paragraph (4) of this subsection, such evidence shall be given in the presence of the defendant and shall be subject to cross-examination. The admissibility of the evidence described in this paragraph shall be in the sole discretion of the judge and in any event shall be permitted only in such a manner as to allow for cross-examination by the defendant and to such a degree as not to unduly prejudice the defendant.

(4) Upon a finding by the court specific to the case and the witness that the witness would not be able to testify in person without showing undue emotion or that testifying in person will cause the witness severe

7. Finally, Foster claims that his trial counsel failed to provide effective representation. In order to prevail on this claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, Foster must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

---

physical or emotional distress or trauma, evidence presented pursuant to this subsection may be in the form of, but not limited to, a written statement or a prerecorded audio or video statement, provided that such witness is subject to cross-examination and the evidence itself will not be available to the jury during deliberations. Photographs of the victim may be included with any evidence presented pursuant to this subsection.

(b) In presenting such evidence, the victim, the family of the victim, or such other witness having personal knowledge of the impact of the crime on the victim, the victim's family, or the community shall, if applicable:

(1) Describe the nature of the offense;

(2) Itemize any economic loss suffered by the victim or the family of the victim, if restitution is sought;

(3) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

(4) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

(5) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

(6) Include any other information related to the impact of the offense upon the victim, the victim's family, or the community that the court inquires of.

(c) The court shall allow the defendant the opportunity to cross-examine and rebut the evidence presented of the victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, or the community, and such cross-examination and rebuttal evidence shall be subject to the same discretion set forth in paragraph (1) of subsection (a) of this Code section.

(d) No sentence shall be invalidated because of failure to comply with the provisions of this Code section. This Code section shall not be construed to create any cause of action or any right of appeal on behalf of any person.

The aspects of trial counsel's representation that Foster alleges were ineffective are: failure to adequately investigate the issues regarding the composition of the grand and traverse jury arrays; failure to sufficiently support the challenges to those arrays with evidence; failure to specifically and sufficiently object to the victim impact evidence; and failure to preserve for appeal issues that Foster does not specify. The trial court did not err in ruling that, had counsel taken the actions that Foster now advocates, there was no reasonable probability of a different result at trial. See Divisions 2 and 6, supra.

*Judgments affirmed. All the Justices concur.*

DECIDED NOVEMBER 1, 2010.

*Herbert Adams, Jr.*, for appellant.

*Tracy Graham-Lawson, District Attorney, Kathryn L. Powers, Erman J. Tanjuatco, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth A. Harris, Assistant Attorney General*, for appellee.