**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**November 1, 2021**

# In the Court of Appeals of Georgia

A21A1059. GARLAND v. THE STATE.

RICKMAN, Chief Judge.

Following a jury trial, Jenna Marie Garland was convicted on two misdemeanor counts of violating the Georgia Open Records Act.[1] She filed a motion for new trial, which the trial court denied. Garland argues that the evidence was insufficient to support her convictions. She further asserts that the trial court erred by denying her motion for new trial because the court erroneously admitted expert testimony; failed to grant a mistrial based upon comments made by the prosecutor during closing argument; and denied her request to give two jury instructions. Finally, Garland

---

[1] See OCGA § 50-18-74 (a).

argues that the trial court erred by refusing to sentence her under Georgia's First Offender Act.[2] For the reasons set forth below, we find no error and affirm.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).

(Citation and punctuation omitted.) *Laster v. State*, 340 Ga. App. 96, 97 (796 SE2d 484) (2017).

So construed, the evidence adduced at trial showed that in 2017, Garland worked as press secretary for then-Mayor of Atlanta, Kasim Reed. In that role, Garland was involved in responding to requests made for public records pursuant to Georgia's Open Records Act (the "Act"),[3] which requires in general that a government agency produce all existing and available public records responsive to

---

[2] See OCGA § 42-8-60 et seq.

[3] See OCGA § 50-18-70 et seq.

2

a request "within a reasonable amount of time not to exceed three business days of receipt of [the] request." See OCGA § 50-18-71 (b) (1) (A).

In early 2017, the newsroom of WSB-TV, a local news station, received a tip that certain elected officials in Atlanta were getting "sweetheart deal[s]" on their water bills. On February 28, 2017, Terah Boyd, a special projects producer from the station, sent an open records request to the Director of Communications and Community Relations for the City of Atlanta's Department of Watershed Management (the "Director") seeking the water usage, billing, and payment records associated with four separate addresses within the City of Atlanta ("the City"). The Director forwarded the request to an employee within the Watershed Department who had access to the computer system and who successfully obtained the records that same day. The employee recognized that three of the requested billing records corresponded to properties owned by then-Mayor Reed and his brother;[4] that all three of those properties were in arrears and had gone unpaid for a significant period of

---

[4] As described more fully below, it was later discovered that Boyd had inadvertently misspelled one of the street names in her original request for the records; nevertheless, despite the misspelling, the records that were pulled and ultimately produced corresponded with Boyd's intended address.

3

time;[5] and that two of the properties had disconnect notices and the third was under investigation for water theft. The employee immediately notified the Director.

Because the requested records involved the mayor and his family, the Director understood that she was required to obtain approval from the mayor's office before the records could be released and, consequently, she notified Garland of the request. The Director sent the records to Garland for her review the following day, and was instructed by Garland to hold them until she authorized their release. Garland did ultimately authorize the release of the records, and they were produced to Boyd on March 3, 2017, within the statutory deadline. As produced, the documents were identifiable only by account number, but in response to a follow-up email from Boyd, the Director clarified which address was associated with each account number.

Upon her receipt and review of the records, Boyd discovered that she had misspelled one of the street names associated with the mayor's brother in her initial request for the documents. Consequently, on March 7, 2017, she submitted a second open records request to the Director for the billing records associated with the correctly-spelled address. In the interim, Boyd and Garland had a telephone

---

[5] The mayor's personal residence had an outstanding balance of $358.12, and the two properties owned by his brother had outstanding balances of $2,870.64 and $8,849.82, respectively. The latter had gone unpaid since 2012.

4

conversation in which Boyd relayed to Garland that she was looking into the newsroom tip about elected officials receiving special treatment on their water bills to see if it was worth reporting on. Garland subsequently sent a series of text messages to the Director, instructing her to "be as unhelpful as possible," "drag [the request] out as long as possible," and "provide information in the most confusing format available." Later that same day, Boyd sent a request for the billing records associated with an address belonging to a member of Atlanta's City Council.

On Friday, March 10, 2017, three days after the request for the record associated with the corrected address, the Director, who had obtained the record but had not yet received permission from Garland to release it, informed Boyd that she would produce it on Monday, March 13. When Boyd had not received the record by Tuesday, March 14, she emailed the Director for a status update. The Director had been instructed by Garland to inform Boyd that the record would be produced the following Monday, March 20. The record was finally produced on that date and despite the initial misspelling of the address, it appeared to be the same record as that which had already been produced, although it contained an additional billing cycle.

The following day, on March 21, Boyd sent the Director an open records request for the billing records of 13 additional addresses associated with members of

5

Atlanta's City Council, and reminded her that she was still awaiting the billing records for the council member's account that had been requested on March 7. The Director informed Garland of the request. The additional records were compiled and received by the Director three days later, on March 24, and showed that three of the council members' accounts were delinquent and had been subject to disconnect notices. The Director sent the records to Garland for her review, and Garland instructed her to inform Boyd that they would be produced two weeks later, on Friday, April 7.

On April 7, however, Garland sent the Director a text message instructing her to continue to "hold all [the records] until [Boyd] asks for [an] update." When Boyd asked for the status of the documents later that evening, the Director informed Boyd that she had already left the office and that the records would be produced the following Monday, April 10.

On the morning of Monday, April 10, after being instructed to do so by Garland, the Director requested that her employee rerun the billing records for the addresses associated with the council members. The updated records were prepared and supplied to the Director by midday. The records reflected that two of the members' accounts remained in arrears, but that one of the member's accounts had

been made current. Garland was informed that the updated records had been compiled but continued to withhold authorization for their release.

Later on Monday, Boyd sent the Director an email inquiring as to the status of the requested records and received no response. On Wednesday, April 12, still having not obtained the records, an attorney representing WSB-TV sent a letter to the Director as well as certain members of the legal department demanding the production of the records. They were finally released on April 14.[6]

The Georgia Attorney General filed an accusation charging Garland with two counts of violating the Act, alleging that she "knowingly and willingly attempt[ed] to frustrate" access to records responsive to Boyd's March 7, 2017 and March 21, 2017 requests. Garland was tried by a jury in the State Court of Fulton County and was convicted on both counts. She filed a motion for new trial, which the trial court denied. This appeal follows.

As an initial matter, we note that the Act mandates that "[a]ll public records shall be open for personal inspection and copying, except those which by order of a

---

[6] In the interim, the Director was terminated from her position.

court of this state or by law are specifically exempted from disclosure."[7] OCGA § 50-18-71 (a). The statute further provides that upon request, a government agency "shall produce" for inspection all responsive records "within a reasonable amount of time not to exceed three business days of receipt of [the] request." OCGA § 50-18-71 (b) (1) (A). In the event that some, but not all, of the requested records are available within three business days, the agency "shall make available within that period those records that can be located and produced." Id. Finally, if responsive records exist but are unavailable within three business days of receipt of the request, "the agency shall, within such time period, provide the requester with a description of such records and a timeline for when the records will be available for inspection or copying and provide the responsive records or access thereto as soon as practicable." Id.

As relevant to this case, the Act is violated when a person "knowingly and willingly frustrat[es] or attempt[s] to frustrate the access to records by intentionally making records difficult to obtain or review." OCGA § 50-18-74 (a). A person who does so may face either civil or criminal penalties, or both. See id.; see also OCGA § 50-18-73 (a).

---

[7] There is no dispute that the records at issue in this case were not exempted by court order or by law. See OCGA § 50-18-72 (a).

8

1. Garland argues that the evidence was insufficient to support her convictions. Specifically, she contends that the State failed to prove that venue was proper in Fulton County; that she knowingly violated the Act in connection with Boyd's March 7 request; and that she acted in bad faith in handling Boyd's March 21 request. We will address each in turn.

(a) Garland argues that the State failed to prove that the crimes were committed in Fulton County. She maintains that proper venue in this case was the county from which her text messages originated, and that the State failed to prove she was in Fulton County when the messages were sent.

As a general rule, "all criminal cases shall be tried in the county where the crime was committed." Ga. Const. of 1983, Art. IV, Sec. II, Para. VI. "[V]enue is a jurisdictional fact the State must prove beyond a reasonable doubt in every criminal case." (Citation and punctuation omitted.) *Worthen v. State*, 304 Ga. 862, 865 (3) (a) (823 SE2d 291) (2019). Venue may be established using either direct or circumstantial evidence, and the determination of whether it has been established rests solely with the jury. See id. As with any challenge to the evidence of guilt, we determine only whether, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that the

9

crime was committed in the county in which the defendant was tried. See id.; *Martin v. McLaughlin*, 298 Ga. 44, 46 (779 SE2d 294) (2015).

Garland was accused of violating the statute by knowingly and willingly frustrating Boyd's access to water billing records by intentionally instructing the Director to make it difficult for Boyd to obtain them. In other contexts, we have held that venue in communication-based crimes is proper in either the county in which the communication was sent or the one in which it was received. See generally *Reeves v. State*, 346 Ga. App. 414, 417 (1) (a) (816 SE2d 401) (2018) (holding that venue in crimes premised upon telephone communications is proper in "either the location from which the call originated or the place at which the call is received").

The evidence presented in this case established that the Director worked for the Department of Watershed Management and that her office was in Fulton County; that the Department of Watershed Management managed the water billing records sought by Boyd; and that Garland's office in City Hall was located in Fulton County. The record further showed that upon receipt of Boyd's requests, the subject records were compiled and sent from the Director's office to Garland's office for her review and to await her authorization of release. Finally, the evidence established that the text communications were sent on business days and during business hours.

10

This evidence was sufficient to permit a rational jury to find beyond a reasonable doubt that venue in Fulton County was properly laid. See *Reeves*, 346 Ga. App. at 417 (1); see also *Worthen*, 304 Ga. at 865 (3). This is true even if there was some evidence to suggest that Garland may not have been physically present in her office when she sent one of the text messages at issue. See OCGA § 17-2-2 (h) (providing, in crimes involving more than one county, "if . . . it cannot be determined in what county a crime was committed, it shall be considered to have been committed in any county in which the evidence shows beyond a reasonable doubt that it might have been committed."). Compare *Mize v. State*, 187 Ga. App. 418, 419 (2) (370 SE2d 525) (1988) (holding, in appellant's trial for influencing a witness, that evidence of venue was insufficient when, at the time the threat was made over the telephone, the evidence showed that the victim was not in the county in which the case was tried and there was no evidence presented as to appellant's location).

(b) With respect to Garland's conviction on the charge stemming from Boyd's March 7, 2017 request for records and Garland's text messages instructing the Director to "[d]rag this out as long as possible" and "provide information in the most confusing format available," Garland argues that the evidence was insufficient to prove that she knowingly violated the Act. More specifically, she points out that

11

Boyd's March 7 request asked for records associated with two separate addresses: one "re-request" for the corrected address associated with the mayor's brother, and the second for an address associated with a different member of the city council. According to Garland, although the accusation alleged specifically that she "knowingly and willingly" attempted to frustrate access to the re-requested records associated with the mayor's brother, the State failed to prove that she knew about that request and/or that her attempts related to that specific request as opposed to the records associated with the council member's address.

The record shows that Boyd's March 7 re-request for the records associated with the mayor's brother was sent via email at 9:02 a.m., and its receipt was confirmed by the Director at 11:13 a.m. At 2:15 p.m., Garland sent the Director a text message stating that she had spoken to Boyd about the tips coming into the newsroom, and she sent the text messages to "[d]rag this out as long as possible" and "provide information in the most confusing format available" at 2:18 and 2:19 p.m., respectively. Boyd's second March 7 request for the records associated with the other city council member was not sent until 2:31 p.m. Boyd did not have any other pending open record requests.

This evidence was sufficient for the jury to infer that Garland knew about Boyd's request for the corrected records, and to further support the jury's determination that Garland was attempting to frustrate access to the records associated with the mayor's brother – and not the records associated with the second requested address – at the time she sent the text messages underlying the accusation. See generally OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."); *Collett v. State*, 305 Ga. 853, 855 (1) (828 SE2d 362) (2019) ("Where the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.") (citation and punctuation omitted). This conclusion is further supported by evidence that Garland did, in fact, refuse to authorize release of the re-requested records associated with the mayor's brother in a timely fashion. See generally *Foster v. State*, 288 Ga. 98, 100 (1) (701 SE2d 189) (2010) ("[I]ntent may be inferred from conduct before, during and after the commission of the crime.") (citation and punctuation omitted).

13

(c) Garland further contends that the State failed to prove that she did not act in good faith when, on April 7, she instructed the Director to "[h]old all" documents responsive to Boyd's March 21 request for records associated with the 13 council members "until [Boyd] asks for [an] update."

The Act provides that, "[i]t shall be a defense to any criminal action . . . that a person has acted in good faith in his or her actions." OCGA § 50-18-74 (a). During the trial, Garland presented evidence that at the time that she sent the April 7 text message, there was an ongoing federal investigation into the mayor's administration and that the City was inundated with open record requests; there were ongoing discussions with the City's law department as to what records were subject to disclosure; and efforts were being made to inform the council members that their billing records were being requested.

Nevertheless, the State also presented evidence that the records at issue had already been prepared and reviewed and were otherwise ready to be produced at the time that Garland sent the text directing that they be held. Further, the attorney who handled open records issues for the City testified that there was no debate in the City's law department about whether the council members' water billing records were subject to production under the Act. And finally, there is no requirement in the law

that required the council members to be made aware that their water billing records had been requested.

"Intent may be found by the jury upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is being prosecuted." See *Palmer v. State*, 243 Ga. App. 656, 657 (533 SE2d 802) (2000). In a criminal case, the question as to whether the requisite intent has been shown is uniquely one for the jury, and we will not disturb the jury's determination as to intent unless its verdict is unsupportable as a matter of law. See id. There was evidence from which a reasonable juror could find that Garland acted with the requisite criminal intent when she sent a text message instructing the Director to hold the records at issue in this case. See generally *Barnes v. State*, 296 Ga. App. 493, 495 (675 SE2d 233) (2009).

2. Garland argues that the trial court erred by allowing what she contends was unqualified and irrelevant expert testimony on behalf of the State. We disagree.

During its case-in-chief, the State presented a witness to testify, over Garland's objection, "as an expert in journalism and First Amendment law, specifically open records laws." The trial court determined that journalism was a trade outside of the

kin of the average juror, and qualified the witness to testify as an expert about how the Act is used by journalists.

Georgia law generally allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." OCGA § 24-7-702 (b). In a criminal case, "the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-7-707. The trial court has broad discretion when accepting or rejecting the qualifications of an expert witness, and we review a trial court's ruling on both the qualification of an expert and the admissibility of that expert's testimony for an abuse of discretion. See generally *Flannigan v. State*, 305 Ga. 57, 60 (2) (a) (823 SE2d 743) (2019); *Hambrick v. State*, 353 Ga. App. 666, 675 (3) (839 SE2d 664) (2020).

(a) The trial court qualified the State's witness as an expert in journalism and First Amendment law, and specifically open records laws. Garland argues that the trial court erred by qualifying the expert because he did not have the requisite qualifications specifically as to Georgia's Open Records Act.

16

To qualify as an expert under Georgia law, "generally all that is required is that a person must have been educated in a particular skill or profession," and his or her "special knowledge may be derived from experience as well as study." *Flannigan*, 305 Ga. at 60 (2) (a).

The challenged witness held an undergraduate degree in journalism, a law degree, and a Ph.D. in journalism. At the time of trial, he was a professor of journalism at the University of Georgia, teaching both undergraduate and graduate students. He also taught media law and First Amendment law to law students at the university's law school. The witness worked as a consultant for news organizations, journalists, and professional journalism associations, helping them learn how to use public records laws. He further wrote for newspapers, magazines, and news websites, and gave presentations on media law and First Amendment issues. The witness had specifically studied Georgia's Open Records Act.

From this evidence, we find no abuse of discretion in the trial court's determination that the witness was qualified to testify as an expert in journalism and First Amendment law. See generally *Williams v. State*, 279 Ga. 731, 732 (2) (620 SE2d 816) (2005); *Attaway v. State*, 279 Ga. App. 781, 782 (1) (632 SE2d 397) (2006). Although Garland takes issue with the witness's focus on the general

17

principles of open records laws, as opposed to Georgia's Open Records Act specifically, "[a]ny perceived weaknesses in his qualifications . . . were matters of weight and credibility for the jury in evaluating his testimony." *Lopez v. State*, 350 Ga. App. 662, 664 (1) (829 SE2d 862) (2019).

(b) Garland further argues that the witness's testimony was both irrelevant and prejudicial. He specifically challenges the following statements, which the expert gave in response to the State's question about what he was hired to teach the news/professional organizations and journalists who hired him as a consultant: "[J]ournalists . . . rely on all kinds of sources of information . . . [and] will make public records requests to try to learn from documents how government is behaving. The public records are essential to journalism–" The expert did not finish his sentence because Garland's counsel objected, and the trial court sustained the objection.[8]

Garland contends that "how journalists use [the Act], or its importance, is not relevant to whether [she] violated [the law]," and that any such testimony was overly prejudicial to her defense.

---

[8] Throughout this trial, objections were made and arguments heard during unrecorded bench conferences with the trial judge. We would like to take this opportunity to remind the bench and bar that we are unable to review bench conferences that are not transcribed by the court reporter and made part of the appellate record.

Georgia law provides generally that, "[a]ll relevant evidence shall be admissible" at trial, unless limited by law or other rules. OCGA § 24-4-402. Nevertheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" OCGA § 42-4-403. The exclusion of relevant evidence under this balancing test, "is a matter committed principally to the discretion of the trial courts, but . . . is an extraordinary remedy that should be used only sparingly." (Citation and punctuation omitted.) *King v. State*, 338 Ga. App. 783, 786 (792 SE2d 414) (2016).

The trial court determined that the criminal charges against Garland related to the trade of journalism, and that the standards and methods generally acceptable to that trade were not known to the average person. The court concluded that the expert's testimony "would be helpful to this jury in understanding the issues that [were] before it."

The trial court did not abuse its discretion by allowing the expert testimony. See OCGA §§ 24-4-402; 24-7-707. The challenged statements explaining how journalists used open records laws were relevant to the issue for which the trial court allowed the testimony; namely, to assist the jurors by providing context as to the

19

standards and methods used in the trade of journalism. See generally *Parks v. State*, 304 Ga. 313, 320 (2) (818 SE2d 502) (2018).

We reject Garland's assertion that any alleged prejudice caused by the statements outweighed their probative value. See OCGA § 24-4-403. Contrary to Garland's position, the expert did not testify as to the importance of the Act. Although it does appear that he began to comment on the importance of public records generally to journalism, he did not finish his statement because the trial court sustained Garland's objection following an unrecorded bench conference. The record does not reflect that Garland requested any further remedial action be taken by the trial court. See generally *Ponder v. State*, 297 Ga. 653, 654 (2) (777 SE2d 249) (2015) (recognizing that in the absence of a request, the trial court does not err by failing to take additional action after sustaining an objection).

3. Garland asserts that the trial court erred by denying her motion for mistrial based upon a statement made by the prosecutor during closing argument. Garland, however, did not object to the statement at the time it was made; rather, she waited until the end of closing argument to object, and until the end of the trial court's final instructions to the jury before moving for a mistrial. "[I]t is plain that a defendant must timely object to the alleged impropriety in closing argument so that the trial

court can take remedial action, if any is warranted." *Butler v. State*, 273 Ga. 380, 384 (8) (541 SE2d 653) (2001). It follows that this issue was not preserved for appeal. See *Cowart v. State*, 294 Ga. 333, 337 (3) (751 SE2d 399) (2013).

4. Garland contends that the trial court committed reversible error by denying her requests to instruct the jury (a) as to the definition of "knowingly and willfully;" and (b) that good faith is a element of the crimes charged, and the State must disprove good faith beyond a reasonable doubt.

"A request to charge must be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence." (Citation and punctuation omitted.) *Hudson v. State*, 308 Ga. 443, 445 (2) (841 SE2d 696) (2020). "It is error to refuse to give a charge only where the request is a correct statement of law that is pertinent and material to an issue in the case and not substantially covered by the charge actually given." (Citation and punctuation omitted.) *Taylor v. State*, 272 Ga. 744, 745 (1) (534 SE2d 67) (2000).

With respect to the crimes for which Garland was accused, the trial court instructed the jury, in pertinent part, as follows:

> [A] person commits the offense of violation of the Open Records
> Act when she knowingly and willfully violates the provisions of Article

21

4 and Chapter 18, Title 50 of the Official Code of Georgia Annotated, commonly referred to as the Open Records Act, by knowingly and willingly attempting to frustrate the access to records not subject to exemption from the Act by intentionally making records difficult to obtain for review.

A person commits criminal attempt to commit a violation of the Open Records Act when, with intent to commit violation of the Open Records Act, that person performs any act that constitutes a substantial step toward the commission of the crime of violation of the Open Records act. It shall be a defense to any criminal action under the Open Records Act that a person has acted in good faith or in his or her . . . action.

(a) Garland requested that the trial court give a jury instruction defining the term "knowingly and willingly." The trial court denied her request.

The trial court's charge on the crime of violation of the Act tracked the language of the statute. See OCGA § 50-18-74 (a); see also OCGA § 16-4-1. The trial court did not err by refusing to further define the terms "knowingly and willingly" because "[t]hese words are not in any sense technical or words of art, the meaning of which would not be understood by people of ordinary experience and understanding." (Citation and punctuation omitted.) *Philpot v. State*, 268 Ga. 168, 171 (3) (486 SE2d 158) (1997) (holding "knowingly" is an "ordinary term[ ] found in common usage and

understood by people of common and ordinary experience"); *Carroll v. State*, 157 Ga. App. 113, 114 (1) (276 SE2d 267) (1981) (holding that "'[w]ilfully' is certainly a term in common usage" and the trial court did not err by refusing to define it).

(b) Likewise, the trial court did not err by denying Garland's request to instruct the jury that good faith is an element of the crimes charged, and that the State must disprove good faith beyond a reasonable doubt.

As before, the trial court tracked the language of the statute when instructing that good faith was a defense to any criminal action under the Act's provisions. See OCGA §50-18-74 (a). Further, the trial court charged the jury that the defendant is presumed innocent, that intent is an essential element of any crime and must be proved by the State beyond a reasonable doubt, that a defendant will not be presumed to have acted with criminal intent, and that intent could be shown in certain, specified ways. Thus, the trial court's charge as given substantially covered the principle of law embodied in Garland's requested charge, and the trial court did not err by refusing to give it. See *Lewis v. State*, 245 Ga. App. 234, 236 (3) (b) (537 SE2d 111) (2000) ("[I]f the jury is properly instructed on criminal intent, the trial court does not err in failing to charge the jury on 'good faith.'"); see also *Copeland v. State*, 263 Ga. App. 776, 780 (2) (589 SE2d 319) (2003).

5. Finally, Garland contends that the trial court erred by denying her first offender status pursuant to Georgia's First Offender Act, OCGA § 42-8-60 et seq. We disagree.

The First Offender Act provides that

When a defendant has not been previously convicted of a felony, the court may, upon a guilty verdict or plea of guilty or nolo contendere and before an adjudication of guilt, without entering a judgment of guilt and with the consent of the defendant, defer further proceedings and: (1) [p]lace the defendant on probation; or (2) [s]entence the defendant to a term of confinement.

OCGA § 42-8-60 (a). "If the probation or incarceration term is completed without violation, the defendant is discharged without an adjudication of guilt and is not considered to have a criminal conviction." (Citation and punctuation omitted.) *Planas v. State*, 296 Ga. App. 51, 52 (1) (673 SE2d 566) (2009); see OCGA § 42-8-60 (e). The determination of whether to offer a criminal defendant first offender treatment rests solely with the trial court. See *Higdon v. State*, 311 Ga. App. 387, 389 (715 SE2d 741) (2011). This court will reverse that decision only "when the record clearly establishes either that the trial court refused to consider first offender treatment on the merits or erroneously believed that the law did not permit such an exercise of

discretion." (Citation and punctuation omitted.) *Graydon v. State*, 313 Ga. App. 580, 581 (722 SE2d 173) (2012).

In this case, Garland did not request first offender treatment at the time of sentencing, but later filed a motion seeking retroactive application of the first offender statute. Following a hearing, the trial court denied the motion. The trial court explicitly recognized in its order that it had the duty to consider Garland's motion. The court continued:

> The Court carefully considers the unique public nature of this case, the facts and circumstances of which it retains specific and detailed recollection, having presided throughout each day of the multi-day trial as well as over pre-trial motions and post-trial sentencing proceedings. Upon consideration of all facts and circumstances, the argument of counsel, and applicable law, [Garland's] motion is DENIED.

It is clear from the order that the trial court considered Garland's motion on the merits and exercised its discretion to deny it. Thus, there is no ground upon which this Court may reverse. See *Graydon*, 313 Ga. App. at 581-582.

*Judgment affirmed. McFadden, P. J., and Senior Appellate Judge Herbert E. Phipps concur.*

25