## A03A1569. COPELAND v. THE STATE.
### (589 SE2d 319)

JOHNSON, Presiding Judge.

A jury found Carlos Copeland guilty of two counts of cruelty to children in connection with the malnourishment of his live-in girl-friend's two-year-old twins.[1] He appeals from the convictions entered on the verdict, challenging the court's denial of his motion for a directed verdict of acquittal based on the sufficiency of the evidence, the court's denial of his motion for a directed verdict or mistrial for alleged prosecutorial misconduct regarding photographic evidence, the court's denial of his motion for a mistrial based on an allegedly prejudicial remark made by the prosecutor, the court's refusal to give the jury a charge on knowledge, and the presence of a prejudicial statue in front of the courthouse. None of the arguments presents grounds for reversal, so we affirm Copeland's convictions.

1. The state charged Copeland with committing cruelty to children, alleging that he jeopardized the children's health while they were in his custody by wilfully depriving them of necessary sustenance.[2] In two enumerations of error, he contends the trial court erred in denying his motion for a directed verdict of acquittal because the state failed to prove that he wilfully deprived the children of necessary sustenance, and that their health or well-being was jeopardized. He maintains that the children were fed properly and were basically healthy, and attributes any weight and development problems they may have had to their premature births, reflux, and vomiting.

The standard of review for the denial of a motion for directed verdict of acquittal is the same as that for reviewing the sufficiency of the evidence to support a conviction.[3] Under that standard, we view the evidence in a light most favorable to the jury's verdict and

---

[1] Copeland's girlfriend, Malaika Range (who had become his wife by the time of trial), was tried with Copeland and also found guilty of two counts of child cruelty. Her appeal is not before us.

[2] See OCGA § 16-5-70 (a).

[3] *Bollinger v. State*, 259 Ga. App. 102 (1) (576 SE2d 80) (2003).

determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4] Conflicts in the testimony of the witnesses are a matter of credibility for the jury to resolve.[5]

Viewed in a light most favorable to the verdict, the evidence at trial shows that Malaika Range gave birth to a female infant and a male infant on November 13, 1998. The babies were born two months prematurely; each weighed about two and a half pounds at birth. The female child remained in the hospital, in order to gain weight, until January 1999. When she was discharged, she weighed five pounds. The male child was hospitalized a short time longer because he suffered from gastroesophageal reflux. He was discharged in February 1999 weighing seven pounds, three ounces. The infants were discharged with no serious medical problems.

Copeland met Range in September 1999, and moved in with Range, the twins, and Range's four-year-old daughter around Christmas 1999. Both Copeland and Range took care of the children, including feeding them. Copeland testified that he accepted and protected Range's children as if they were his own.

In late February 2001, Range gave birth to a fourth baby at Southern Regional Hospital. On March 2, 2001, Copeland took Range's eldest daughter and the twins, who were two and a half years old, to visit Range in the hospital. A nurse at the hospital noticed that the toddlers looked severely underweight and contacted a hospital social worker.

An investigator with the Department of Family and Children Services came to the hospital room and saw the family. She noticed that the children appeared to be in very poor condition, and noted that the children were so thin she "could see all the bones in their face[s]." The children were awake, but they lay in their car seats motionless. Although they were reluctant to do so, Copeland and Range allowed the investigator and a police officer to take the children to the emergency room for an examination.

When the children's clothing was removed, the investigator "could see all of the ribs in their bod[ies]. Their stomachs were huge, looked bloated; legs, arms, like stick figures." The children did not move on their own the entire time the investigator was with them. Photographs taken of the children immediately after the examination are included in the record.

An emergency room physician examined the children who, at two and a half years old, weighed 13 and 14 pounds. The physician

---

[4] Id.
[5] Id.

testified that the children were limp, weak, lethargic, had no subcutaneous fat tissue, could not bear weight on their legs, could not sit up on their own, could not crawl, and were severely underweight and malnourished. The doctor described the boy as "skin and bones." When the doctor attempted to make the children stand up, they collapsed. When he attempted to sit the children up, they fell over. At their age, the children should have been walking, running, interacting, speaking, and laughing. In the two years since their discharge from the hospital following their births, the female child gained only nine pounds, and the male child gained only five and a half pounds. The physician noted that at the age of two and a half years a healthy child born prematurely should weigh between 24 and 32 pounds. The investigator testified that the children quickly ate all the food she gave them following the emergency examination. DFACS took custody of the children and placed them in foster care.

A week later, on March 9, 2001, the children were taken to Children's Healthcare of Atlanta for another examination. A nurse practitioner examined the children, and a supervising pediatrician, who had trained extensively in the area of child abuse and was qualified as an expert in the field of pediatric medicine, reviewed the medical records, x-rays, and videotapes taken during the examination. The pediatrician testified that "there was no question" that the infants were suffering severely from a condition known as "failure-to-thrive." The doctor testified that the babies had no subcutaneous fat, had bulging abdomens, could make sounds but not say any words, could not bear weight, had very delayed bone development, and were severely malnourished. The children were not experiencing vomiting, diarrhea, or other gastrointestinal symptoms. The pediatrician saw no medical reason for the children's failure to thrive.

On March 28, 2001, the foster parent took the children to a pediatrician's office for an examination. The pediatrician testified that at this visit the female child weighed 19 pounds, and the male child weighed nearly 18 pounds. He noted that the children looked malnourished, that they lacked fat tissue on their faces and extremities, and had distended abdomens. The children, who cried throughout the examination, could not stand, walk, or talk. The doctor diagnosed the children as suffering from severe malnutrition and developmental delays.

On April 10, 2001, the children were again examined at Children's Healthcare. This time they were physically examined by the pediatrician who earlier reviewed the records and videotape evidence. Various tests revealed no medical reason for their malnourishment. At this visit, which was six weeks after the children were removed from the custody of their parents, the female child weighed 21 pounds, and the male child weighed 19.5 pounds; thus, they

gained about as much weight during their first six weeks in foster care as they had in two years under Copeland's and Range's care. The pediatrician testified that had the children's failure to gain weight been caused by an organic condition, such as a parasite or infection, it could have only been resolved by medical treatment.

While in foster care, the children were fed "regular" meals, and were not treated for any medical condition. They began to grow, walk, and talk. As of January 2003, the four-year-old female child weighed 46 pounds, and her twin brother weighed 47 pounds. The record includes photographs which show their progress.

Copeland testified that he and Range had been feeding the infants breast milk, formula, cereal, and, as they grew older, table foods, three to four times per day, in portions that were "slightly bigger than regular." Copeland said that the children were fed "regular stuff like hamburgers, lasagne, fries, grits and eggs," as well as snacks. Although Copeland maintained that the babies' low weight could be explained in large part by their prematurity, one of the pediatricians testified that if the babies were properly fed, they would grow "just like normal other premature babies," that premature babies "catch up" with their peers at about one year, and that he saw no reason for the twins to not be growing if they were fed the foods Copeland claimed to have been feeding them. Similarly, the Children's Healthcare pediatrician testified that the children could not have been fed in the manner Copeland claimed they were and have been as malnourished as they were in March 2001. She added that had the twins been left with Copeland and Range in the condition they were in, they could have died.

The term "necessary sustenance," as used in OCGA § 16-5-70 (a), has consistently been defined as that necessary food and drink which are sufficient to support life and maintain health.[6] This Code section does not contain an element of malice.[7] What is required under OCGA § 16-5-70 (a) is that the defendant wilfully deprives the child of necessary sustenance and that as a result, the child's health or well-being is jeopardized.[8] Direct medical, photographic, and testimonial evidence shows that the children were severely malnourished and that their health was jeopardized. Whether Copeland either perpetrated or otherwise was a party to the acts, and whether the acts were done wilfully, were issues for jury resolution.[9]

Despite Copeland's claim to the contrary, a review of the record in a light most favorable to the verdict reveals ample evidence from

---

[6] *Knight v. State*, 233 Ga. App. 819, 821 (2) (505 SE2d 796) (1998).
[7] Id.
[8] Id.
[9] See id. at 821-822 (2).

which a rational trier of fact could have found that he wilfully deprived the children of necessary sustenance to the extent that the children's well-being was jeopardized.[10]

Copeland also urges on appeal that because he is not the children's biological father, he had no duty to care for them. His failure to raise that argument below amounts to a waiver.[11] In any event, OCGA § 16-5-70 applies to *any* person supervising the welfare of or having immediate charge or custody of a child. It is clear from the record, including Copeland's own testimony, that he is one of the persons covered by the statute.

The trial court did not err in denying his motion for a directed verdict of acquittal.

2. Copeland complains that the trial court should have given the jury the following charge regarding knowledge: "If you find from the evidence in this case that a defendant had no knowledge that a crime was being committed, and that the defendant did not knowingly and intentionally participate, or commit, or help in the commission of the crime, or was a party to it, to the alleged offense, it would be your duty to acquit the defendant." The proposed charge on knowledge was unnecessary.

The trial court charged the jury that each defendant is presumed innocent, that the jury must consider the guilt or innocence of each defendant separately, that the state is required to prove intent beyond a reasonable doubt, that intent is an essential element of any crime and must be proved by the state beyond a reasonable doubt, that a defendant is not presumed to have acted with criminal intent, and that intent could be shown in certain, specified, ways. The charge given covered substantially the same principles as the charge requested by Copeland.[12] This enumeration presents no basis for reversal.

3. Copeland argues that the trial court erred in failing to grant a mistrial or a directed verdict of acquittal based on the state's failure to allow him to inspect photographic evidence before trial. Although his argument is not clear, Copeland seems to argue that the state had photographs and videotapes of the children, which were not admitted at trial, which it did not give him the opportunity to review before trial.

Contrary to Copeland's contention, the record shows that the state notified him more than ten days before trial that photographic evidence was available for his inspection.[13] There is no evidence that

---

[10] See *Wilson v. State*, 257 Ga. App. 242, 244 (1) (570 SE2d 679) (2002).

[11] See generally *In the Interest of M. C.*, 243 Ga. App. 707, 712 (2) (534 SE2d 442) (2000).

[12] See generally *Mitchell v. State*, 233 Ga. App. 92, 94-95 (5) (503 SE2d 293) (1998).

[13] See OCGA § 17-16-4 (a) (3).

Copeland attempted to inspect the evidence but was denied the opportunity. Copeland has not shown any error by the record.[14]

4. Copeland urges that he was entitled to a mistrial because the prosecuting attorney called the defense attorney a "liar." This enumeration is without merit.

Defense counsel was cross-examining a social worker and asked her if Copeland and Range had become discouraged in their efforts to regain custody of their children. The social worker said she did not remember the word "discouraged" being used. Defense counsel referred the witness to her previous testimony[15] wherein she allegedly said the couple had become discouraged. The witness responded that "that was [defense counsel's] word." Defense counsel reread the line from the transcript to support his position. The prosecuting attorney objected, saying defense counsel was mischaracterizing the earlier testimony and misstating the evidence. The trial court told the prosecutor he could address the matter on redirect. The prosecutor remarked: *"Well, so he gets to just lie in front of the jury?"* The trial judge replied that he assumed defense counsel was reading from the transcript. The prosecutor stated that the transcript does not show that the caseworker said the couple was discouraged. The trial judge read aloud the portion of the transcript at issue, and said "at least we know what the transcript says. And I don't let people lie when they get on the witness stand." He instructed defense counsel to ask his next question. The prosecutor then told the judge, in a bench conference, that the judge told the jury "just now . . . that the [caseworker] just lied on the witness stand." The judge said, "I don't let people lie in my courtroom." The prosecutor replied that the judge implied that the witness lied. The trial judge then instructed the jury that "in no way have I implied that anybody is lying in this courtroom. That's for you to determine. But the point I'm trying to make is my goal here is to not let people lie, I don't care who they are." Defense counsel then resumed cross-examining the witness.

Copeland did not object to or request a mistrial based on the prosecutor's remark. We generally will not grant more appellate relief than that actually prayed for at trial.[16] In any event, Copeland has not shown how the prosecutor's comment about his attorney harmed him or otherwise contributed to the verdict.[17]

Copeland also complains that a mistrial should have been granted after a witness from DFACS stated that Copeland was incarcerated immediately after the children were removed from his cus-

---

[14] See generally *McSears v. State*, 226 Ga. App. 90, 92 (1) (485 SE2d 589) (1997).

[15] A previous trial conducted months earlier resulted in a hung jury and a mistrial.

[16] See generally *Mitchell v. State*, 255 Ga. App. 585, 590 (5) (565 SE2d 889) (2002).

[17] See generally *Temple v. State*, 253 Ga. App. 606, 611 (3) (561 SE2d 132) (2002).

tody. A witness' mere statement that a defendant was in jail for some undisclosed reason does not place his character into evidence.[18] Moreover, there was other testimony, elicited by Copeland's attorney, that on the day DFACS became involved with the children, police had a warrant to arrest Copeland on a bad check charge, that Copeland was arrested on the instant charges, and that he lost his car because he was "locked up." There was no reversible error.[19]

5. Copeland argues that he was prejudiced by the presence of a statue of a policeman and a child located in front of the courthouse. The matter has not been preserved for review, inasmuch as there is no evidence or mention of such a statue in the record.[20]

*Judgment affirmed. Eldridge and Mikell, JJ., concur.*

DECIDED OCTOBER 24, 2003.

*James E. Watkins*, for appellant.
*Robert E. Keller, District Attorney, Staci L. Guest, Assistant District Attorney*, for appellee.

[18] See *Bennett v. State*, 177 Ga. App. 643, 644 (340 SE2d 273) (1986).
[19] See generally *Temple*, supra; *Lewis v. State*, 179 Ga. App. 121, 123 (4) (346 SE2d 70) (1986).
[20] See *McDaniel v. State*, 261 Ga. App. 360, 362 (4) (583 SE2d 141) (2003).