A10A2254, A10A2255. COLEMAN v. THE STATE (two cases).
(708 SE2d 638)

SMITH, Presiding Judge.

A jury found Brent Coleman and his wife Jennifer Ann Coleman guilty of cruelty to children in the first degree. Following the denial of their motions for new trial, the Colemans appeal, citing several claims of error. Because the trial court erred in denying the Colemans' motion for a mistrial, we reverse.

On appeal, both the Colemans complain of the same errors: the trial court erred in (1) allowing evidence of their marijuana purchase and use, (2) denying their motion for mistrial following testimony that their son D. C. was in foster care, and (3) denying their motion for a directed verdict at the close of the State's case. We address each of these claims of error in turn.

1. The Colemans contend that the trial court erred in denying their motions for a directed verdict. "The standard of review for denial of a motion for directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." (Citation and footnotes omitted.) *Gore v. State*, 277 Ga. App. 635, 640 (4) (627 SE2d 198) (2006). Therefore, we construe the evidence in favor of the jury's verdict and determine whether a rational trier of fact could have found the Colemans guilty beyond a reasonable doubt of the crimes of which they were convicted. Id.

---

Construed in this light, the evidence showed that D. C. was born as a normal full-term baby on January 21, 2006, weighing 5 pounds and 11 ounces. When D. C.'s pediatrician saw him on February 2, when he was almost two weeks old, D. C. weighed 4 pounds and 15 ounces. When asked if he was concerned about D. C.'s loss of 12 ounces, the pediatrician testified:

> [I]t's cause for concern. And if the baby is appearing sick, if their profusion [sic] is down, then you would do more investigating. But when you have a child that looks otherwise healthy and especially when they're — when they're that age, you're concerned, but you do it on an outpatient basis. Meaning, you're trying to give hints as far as increasing the input and then bring them back.

Following the examination, the pediatrician scheduled the Colemans to return with D. C. for a follow-up visit four days later, on February 6. On that day, the pediatrician noted that D. C. had gained four ounces and appeared well. He scheduled an appointment for the Colemans to return with D. C. on March 7 for another check-up.

On March 2, however, the Colemans appeared at the emergency room with D. C. The pediatrician was notified that D. C. was in the emergency room and that medical personnel had difficulty intubating him. The pediatrician testified that when he arrived at the emergency room, D. C. was not moving and was "ashen . . . almost yellowish" in color which indicated that his hemoglobin was low. D. C.'s skin was very loose, especially around his abdomen, his blood sugar was extremely low, and he exhibited agonal respirations (taking a gasp of air about once a minute). He had very little muscle mass, was emaciated, and had a very low heart rate. The pediatrician stated simply that D. C. was dying. Nurses made several attempts to find a vein for D. C. to receive fluids intravenously and were eventually able to find a vein in D. C.'s scalp. The only movement D. C. made was when he bit down on the pediatrician's finger as he attempted to tape down the tube that was inserted into D. C.'s trachea. D. C. was diagnosed with hypoxia (i.e., not getting enough oxygen in the bloodstream), respiratory distress, acidosis, and cachexia (i.e., an emaciated appearance caused by an absence of body fat).

The pediatrician explained that it would take a week or more for D. C. to appear in the condition he was in when he arrived in the emergency room. He testified further that between D. C.'s February 6 visit and March 2 when the Colemans appeared in the emergency room with D. C., he had not been contacted by the Colemans with any concerns about D. C.'s health. When asked about D. C.'s prognosis when he observed him in the emergency room, the pediatrician

testified: "I thought it was awful. I thought . . . he was going to die, I really did. To be honest with you, I was amazed that . . . he survived even being able to be transported."

A transport team arrived to transport D. C. to the Medical Center of Central Georgia in Macon. The pediatric intensivist who treated D. C. in Macon testified that D. C. was in intensive care for a week to ten days and that when he began treating D. C., he observed that the baby was emaciated, having a "striking lack of any baby fat, subcutaneous fat," and on a ventilator. He testified further that D. C. was hypothermic, hypoglycemic, and dehydrated. D. C. had a seizure on the first day of his admission, but a subsequent brain scan was normal. The intensivist stated that he observed evidence of auto-cannibalism because D. C.'s body "had eaten away all his body fat." He stated that D. C.'s ribs and backbone were visible and that he had sagging skin on his buttocks and neck. He stated further that D. C.'s condition was consistent with child neglect and starvation and that the loss of subcutaneous fat would take "many days to weeks."[1]

A GBI agent testified that she visited the Coleman home as part of her investigation. She stated that she discovered an empty can of baby formula in the trash and a can of baby formula on the kitchen counter with about three scoops of formula missing from the can.

The Colemans presented several witnesses and testified in their own defense, both denying that they willfully denied D. C. of sustenance. Jennifer's aunt testified that she visited the Coleman home after D. C. was born "just about every day," usually some time between 12:00 p.m. and 3:00 p.m., that she fed D. C. each time she visited, and that she observed Jennifer feed D. C. The aunt stated further that D. C. was "a little baby," that she saw him with his clothes off and had never become concerned about his condition, and that she was at the Coleman home at around 12:30 p.m. on March 2, the same day the Colemans rushed D. C. to the emergency room, and noticed nothing unusual about him.

Jennifer's grandmother testified that there did not appear to her "to be any problem with [D. C.]" when she visited the Coleman home a week before D. C. was taken to the emergency room. She stated further that babies born in her family were small, including Jennifer. Another family member testified that D. C. was a normal but small baby, and recalled that on her only visit to the Coleman home a week and a half before March 2, Jennifer was feeding D. C. when she arrived. Jennifer's cousin testified that she fed D. C. during a visit

---

[1] D. C. was fed intraveneously, then with a feeding tube, and then when he began breathing on his own, with a bottle. Once his condition improved, he was released from the hospital.

two days before D. C. was taken to the emergency room, and Jennifer's twin sister testified that she visited the Coleman home three days a week and was never concerned about D. C.'s condition. She stated further that D. C. appeared normal when she visited the home on March 1 and that she observed both Jennifer and Brent feed him on several occasions.

Jennifer testified that she was concerned about D. C.'s weight loss at his one-week appointment with the pediatrician. She stated that she was instructed by the pediatrician to nurse D. C. on each breast for 15 minutes and to then offer him two ounces of formula. Jennifer stated further that she was excited when D. C. gained back four ounces, but that it never seemed to her that D. C. was losing weight. Sometime between February 10 and 13, Jennifer ceased breast feeding and began making D. C. four-ounce bottles of formula. She explained that D. C. would only drink two and a half or three ounces per feeding.

Jennifer also testified that because D. C. became constipated, she fed him a mixture of one ounce of adult prune juice and one ounce of water for one feeding a day for about a week and a half beginning on February 18 when D. C. was four weeks old. She stated that she did not realize at the time that the adult prune juice was not good for him. Jennifer explained that she first noticed a change in D. C. on the day she took him to the emergency room. She described him as limp and listless, and stated that he would not eat and gave her a blank stare. She held D. C. in her arms and waited on the porch until Brent arrived home from work around 5:00 p.m. Jennifer explained that she waited on Brent because she did not have any remaining minutes on her cell phone to call for help, nor transportation. She stated that en route to the emergency room D. C. stopped breathing.

Jennifer testified that there was never a time that she did not have formula in the house, nor a time when D. C. was not fed every three to four hours. She stated that days before she and Brent took D. C. to the emergency room, D. C. had diarrhea that ran through his diaper and clothing but eventually tapered off the next morning. She explained that D. C.'s "butt bones were always sticking out" and that his "sternum always stuck out."

Brent testified to the same series of events. He explained that he often made bottles and fed D. C. and that D. C. would only eat two and a half or three ounces of formula per feeding. Brent explained further that D. C. became constipated when Jennifer switched from breast feeding to only formula feeding and that he purchased prune juice after a co-worker advised him to give D. C. a mixture of prune juice and water to help relieve his constipation. He stated that D. C. had several "runny" bowel movements after drinking the prune juice and water. He explained that he did not notice any problem

with D. C. when he left for work on the morning of March 2.

OCGA § 16-5-70 (a) provides: "A parent . . . of a child under the age of 18 commits the offense of cruelty to children in the first degree when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized." And "[t]he term 'necessary sustenance,' as used in this Code section, has consistently been defined as that necessary food and drink which is sufficient to support life and maintain health." (Citation omitted.) *Knight v. State*, 233 Ga. App. 819, 821 (2) (505 SE2d 796) (1998). The Colemans argue that the evidence is insufficient because the pediatric intensivist "never opined that the prune juice could not be the cause of the malnutrition opined by him." But when asked about the effect of diarrhea induced by prune juice, the intensivist testified: "If you're getting plenty of calories on top of the prune juice, you still ought to grow. You still should have some diarrhea from dehydration, but you shouldn't be so emaciated and so deplete[d] of any fat stores at all." The Colemans also argue that the State's case was based solely on circumstantial evidence of D. C.'s condition on March 2, but the evidence was not purely circumstantial as two pediatricians, who observed and treated the victim, testified to what they saw. See *Allen v. State*, 278 Ga. App. 292, 294 (1) (628 SE2d 717) (2006).

Direct medical testimony reveals that D. C. was severely malnourished and that his health was jeopardized. Whether the Colemans wilfully perpetrated the act causing D. C.'s condition was an issue for the jury to resolve. See *Copeland v. State*, 263 Ga. App. 776, 779-780 (1) (589 SE2d 319) (2003); *Knight*, supra, 233 Ga. App. at 822 (2). The evidence presented here was sufficient for a rational trier of fact to find the Colemans guilty of child cruelty in the first degree as charged in the indictment; the trial court therefore did not err in denying the Colemans' motion for directed verdict. See *Copeland*, supra.

2. The Colemans contend that the trial court erred in denying their motion for mistrial following the testimony of a DFACS employee who stated that D. C. had been in foster care.

> A trial court has the discretion to grant a mistrial or to give curative instructions, and this court will only interfere with that discretion when granting a mistrial is essential to the preservation of the right to fair trial. When determining whether the trial court abused its discretion, we consider the statement itself, other evidence against the accused, and the actions of the trial court and counsel dealing with the impropriety.

(Citations and punctuation omitted.) *Jackson v. State*, 302 Ga. App.

412, 414 (1) (691 SE2d 553) (2010).

A DFACS investigator was asked on redirect examination: "do you know where [D. C.] is now?" The investigator replied: "No , sir, I do not know. My understanding is that the child was in foster care for a time and —." Counsel for Jennifer objected immediately and the Colemans made a motion for mistrial. The trial court denied the motion for mistrial but granted the Colemans' motion in limine to exclude any further evidence concerning D. C.'s placement. The trial court offered to give a curative instruction, but Jennifer's counsel rejected the offer, stating: "[T]here's no way that that can be corrected by any curative instruction. The damage is done."

The Colemans argue the statement that D. C. "was in foster care for a time" improperly placed their character into issue and implied to the jury that some court had removed D. C. from their home because they committed the acts charged in the indictment. We agree.

Foster care refers to "a private home used by a child-placing agency." See OCGA § 49-5-60 (10). And, generally, a court order removing a child from the child's home is based upon a finding by the court that continuation in the home would be contrary to the welfare of the child. See OCGA § 15-11-58 (a); see also OCGA § 15-11-58 (a) (4) (A) (reasonable efforts to preserve family not required where parent has subjected child to aggravated circumstances). Therefore, the statement that D. C. "was in foster care for a time" could have given the jury the impression either that the Colemans were guilty of the crime charged, or that a court determined that living in the Coleman home was contrary to D. C.'s welfare for some other reason attributable to the Colemans.

In either case, under the particular facts and circumstances here, we hold that the prejudicial effect of the witness's statement could not have been corrected by a curative instruction and that the Colemans' right to a fair trial was prejudiced by it, where, as in this case, the evidence was not overwhelming.[2] See, e.g., *Jackson*, supra, 302 Ga. App. at 417 (1) (when given contradictory testimony defendant's right to fair trial prejudiced by improper testimony of prior incarceration). The trial court therefore abused its discretion in denying the Colemans' motion for mistrial on this ground, and the Colemans are entitled to a new trial.

3. Although we reverse this case in Division 2, we nevertheless address the Colemans' remaining enumeration of error as it may

---

[2] This holding is limited to the particular facts of this case and should not be construed to stand for the proposition that any mention of the involvement of DFACS or foster care in a criminal case creates grounds for per se reversal.

occur at retrial. The Colemans argue that the trial court erred in allowing evidence of their marijuana purchase and use. The Colemans filed separate motions in limine to exclude the evidence. At the hearing on the motions, the State argued that the evidence was admissible because the Colemans commented on their poverty during the investigation, but then spent money to purchase marijuana. The trial court denied the motions stating only: "I have continued my research with regard to the marijuana issue. I am still not as familiar with the facts of the case as you all are, so I am somewhat at a disadvantage. With that being said, I am going to allow the evidence . . . AT THIS TIME." (Emphasis in original.)

At trial, several witnesses testified about the Colemans' purchase and use of marijuana. Trial counsel objected to the first introduction of the testimony and moved for a mistrial. The trial court denied the motion and reminded trial counsel that it had already denied a motion in limine on the issue.

The State contends on appeal, as it did during the hearing on the motion in limine, that evidence of the purchase and use of marijuana was relevant to rebut the Colemans' "assertions of poverty to explain and justify their conduct." The State argues that "[b]y claiming the excuse of poverty for the offense of starving their baby nearly to death, the Appellants made their use of the family money relevant and necessary to the investigation of their conduct." In particular, the State points to the testimony of the DFACS investigator and a GBI agent. The DFACS investigator testified: "I asked [Jennifer Coleman] why she didn't call 911, they said they didn't have a phone and then Mr. Coleman interjected that the only thing they were guilty of or he was guilty of was being poor." The GBI agent stated that Jennifer told her "she did have a TracFone. I guess it's prepaid minutes on a cell phone and that there were not any minutes on that phone on that particular date and that she was unable to call." When the prosecutor asked, "Did [Jennifer Coleman] make any explanation as to why there were no minutes on it?," the agent stated that Jennifer replied, "Money was tight."

The State contends on appeal that evidence that the Colemans purchased marijuana was relevant to rebut the Colemans' claim that they were poor. But the relevant issue is whether they claimed poverty as a defense to the charges against them. The Colemans were charged with willfully depriving D. C. "of necessary sustenance to the extent that said child's health was jeopardized." At no time during the trial did the Colemans claim that they were unable to provide food for D. C. because they were poor. And the State presented no evidence of such a claim. Therefore evidence that the Colemans purchased and used marijuana was not relevant to rebut a claim that they did not make. The marijuana evidence therefore was

not admissible on this ground. See, e.g., *Racquemore v. State*, 204 Ga. App. 88, 89 (2) (418 SE2d 448) (1992) (testimony that defendant stated he was on probation not relevant to explain motive for crime); *Parker v. State*, 162 Ga. App. 271, 274 (5) (290 SE2d 518) (1982) ("As appellant did not raise the issue of consent as a defense to the aggravated sodomy charge, this testimony was not admissible for the purpose of rebutting such contentions. [Cit.]").

*Judgment reversed in both cases. Mikell, J., concurs. Adams, J., concurs specially.*

ADAMS, Judge, concurring specially.

I disagree with Division 2 because the Colemans waived any error when they refused a curative instruction, which might have remedied any error. I agree, however, that the conviction must be reversed for a new trial. With regard to Division 3 and the admission of the evidence of marijuana use, it was reversible error to allow the State to admit evidence of the Colemans' use of marijuana over and above what could have been admitted as res gestae. That error was not harmless because the improper evidence was prejudicial and the evidence of guilt is not overwhelming.

The DFACS worker only testified that "the child was in foster care for a time. . . ." Although the Colemans moved for a mistrial, they turned down the court's offer to give a curative instruction, which normally means that they cannot contest the denial of their motion for mistrial:

> Because curative instructions were offered and refused, [the appellant] cannot now complain of the testimony. *Jones v. State*, 250 Ga. 166, 168 (296 SE2d 598) (1982). Under these circumstances, the denial of the motion for a mistrial was not an abuse of discretion. *Conklin v. State*, 254 Ga. 558, 568 (331 SE2d 532) (1985).

*Bromley v. State*, 259 Ga. 377, 380 (4) (380 SE2d 694) (1989) (testimony that defendant was asked to take a polygraph examination). See also *Williams v. State*, 214 Ga. App. 834, 835 (449 SE2d 532) (1994) (following *Bromley*); *Wilbanks v. State*, 251 Ga. App. 248, 268 (19) (e) (554 SE2d 248) (2001) (statement that defendant was on drugs). Furthermore, "[i]n the absence of a demonstration that a mistrial was essential to preservation of a defendant's right to a fair trial, it is not an abuse of discretion to deny a motion for a mistrial even where no curative instructions were given. [Cit.]" *Bell v. State*, 179 Ga. App. 491 (1) (347 SE2d 321) (1986).

Here, a curative instruction might have remedied any problem. Curative instructions have been used to successfully remedy a host

of testimonial errors concerning improper evidence, although there are limits. See, e.g., *Hall v. State*, 161 Ga. App. 521, 523 (1) (289 SE2d 313) (1982) (evidence of the confession of a co-defendant implicating a defendant cannot be cured by a limiting instruction).

With regard to the mention of foster care, such care is often used for placement of children deemed to be deprived. The jury possibly could be told that the definition of deprivation "focuses upon the needs of the child regardless of parental fault." (Citation and punctuation omitted.) *In the Interest of A. B.*, 285 Ga. App. 288 (645 SE2d 716) (2007). Or a jury possibly could be told that the child was in foster care as a result of the allegations raised against the parents and that additional decisions regarding the child's care will be determined after the trial. Other instructions might be appropriate.

Nevertheless, the case must be reversed because of the improper admission of a large part of the evidence that the Colemans bought and smoked marijuana. I agree with the conclusion that the trial court erred by concluding that the Colemans had raised the issue by claiming that they were poor and that any evidence related to marijuana therefore could be admitted. It is true that evidence of the parents' marijuana use that took place in the first six weeks of their child's life — the dates relevant to the allegations against them — may be admissible as part of the res gestae of the crime. *Pless v. State*, 260 Ga. 96, 98 (2) (390 SE2d 40) (1990); *Carrie v. State*, 298 Ga. App. 55, 58 (1) (c) (679 SE2d 30) (2009). But other evidence of their marijuana use, from times unrelated to the allegations is inadmissible.[3] *Plessy*, 260 Ga. at 98 (2) (distinguishing testimony about the defendant's drug use on the day of the crime from other testimony about the defendant's drug use unconnected with the crime). And given that the evidence of guilt was not overwhelming, admission of the marijuana evidence was prejudicial, reversible error. See *Crosby v. State*, 269 Ga. 434, 435 (3) (498 SE2d 62) (1998) (evidence that defendant possessed a small amount of marijuana was irrelevant and prejudicial); *Hampton v. State*, 300 Ga. App. 49 (684 SE2d 118) (2009) (improper admission of character evidence of "probation for an unspecified prior offense involving cocaine" was reversible error).

DECIDED MARCH 24, 2011 — 

*John L. Tracy*, for appellant (case no. A10A2254).

---

[3] This evidence included that, without any reference to a certain time, Brent Coleman smoked marijuana; that he might still smoke marijuana as of the trial, which was over three years after the relevant incident; that he purchased marijuana for a certain price; and that he had been smoking marijuana for a long time.

*Norman J. Crowe, Jr.*, for appellant (case no. A10A2255).
*C. Paul Bowden, District Attorney, Ronnie A. Wheeler, Assistant District Attorney*, for appellee.