**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 18, 2020**

# In the Court of Appeals of Georgia

A19A2405. HINES v. THE STATE.

BROWN, Judge.

A jury found Nicole Hines guilty on two counts of cruelty to children. She appeals the trial court's denial of her motion for new trial, contending that (1) the trial court erred in admitting evidence related to the Department of Family and Children Services (DFCS) investigation; (2) the trial court erred in admitting the investigating officer's testimony to out-of-court statements made by Hines' boyfriend as well as the officer's recorded interview of the boyfriend; (3) Count 2 of the indictment should have been dismissed for lack of subject matter jurisdiction; and (4) she received ineffective assistance of counsel. We agree that the trial court erred in admitting certain evidence related to the DFCS investigation. Therefore, we reverse and remand.

1. Viewed in the light most favorable to the jury's verdict, see *Woodard v. State*, 352 Ga. App. 322, 325 (1) (835 SE2d 35) (2019), the evidence presented at trial showed the following. In November 2010, Hines, along with her two-year-old daughter and eight-month-old son, were living with Jonathan Irving in Muscogee County, Georgia. At the time, Irving was under the impression that the younger child was his biological child. Hines had previously been living with family in Alabama, but moved in with Irving after the birth of the baby boy. While Irving worked full-time in the military, Hines stayed at home with both of the children.

On November 10, 2010, Irving returned home from work at around noon, and the baby boy appeared normal. During this period, Hines and the older child were also home. When Irving awoke from a nap that evening, he noticed that the baby boy was crying and that the child's knee was extremely swollen. Irving and Hines called both of their parents for advice, and Irving's mother drove from Florida that night to help them. The following day, Hines and Irving's mother took both children to the pediatrician. The older child had a previously scheduled appointment, and while there, Irving's mother asked the pediatrician to examine the boy's knee. After examining the child, the pediatrician instructed Hines and Irving's mother to immediately take the child to the hospital.

The admitting pediatrician who examined the child upon admission to the hospital confirmed that the child had a fracture to his right tibia. After further x-rays, two other fractures were discovered: one at the distal end of the left femur and a second right tibial fracture. The fracture to the left femur showed callus formation, indicating that the bone was healing and that it was an "older" fracture. According to the admitting pediatrician, this older fracture could have occurred "weeks to months" prior to its discovery. Hines suggested that the injuries had been caused by the two-year-old child while both children were playing in a playpen together, and while the admitting pediatrician testified that this story could have explained the newest fracture to the child's right tibia, it could not explain the others. The admitting pediatrician concluded that the child's injuries were non-accidental based on the number of fractures and their differing ages.

Police and DFCS were contacted and spoke with Irving and Hines at the hospital. Both Hines and Irving agreed to come to the police station to speak with the investigating detective. The detective interviewed them separately, and both denied harming the child. When asked by the detective whether Irving was the child's father, Hines replied "yeah." While the detective spoke with Irving, Hines stood outside the door, eavesdropping, and burst into the room in a rage, requiring the detective to

3

physically restrain her while Irving calmed her down. During her outburst, Hines revealed that Irving was actually not the child's father. After speaking with both Irving and Hines and witnessing the outburst, the investigating detective arrested Hines in connection with the child's injuries. Hines was charged with three counts of cruelty to children in the first degree. A DNA test later confirmed that Irving was not the child's biological father.

At trial, both a pediatric radiologist and the chief of pediatrics at the hospital where the child was treated testified that the child's injuries indicated non-accidental trauma.[1] The chief of pediatrics, qualified as an expert in both pediatrics and child abuse, testified that one of the fractures — termed a "bucket-handle" fracture — could have "only [been] caused by abuse." Both physicians confirmed that the fractures differed in age, but neither could pinpoint when the oldest fracture had occurred. According to the chief of pediatrics, the child had "an old fracture, a healing fracture, and a fresh fracture . . . the kind of thing that you only see in child abuse cases. It means that the child was injured twice, generally at days apart."

---

[1] Neither the pediatric radiologist nor the chief of pediatrics examined or treated the child, but both reviewed the child's medical records.

The trial court directed a verdict on one count of cruelty to children in the first degree (Count 3), and the jury returned a guilty verdict on the remaining two counts (Counts 1 and 2). Subsequently, Hines filed a motion for new trial, and a hearing was held. For over three years after the hearing, the trial court failed to rule on Hines' motion, and nothing in the record explains this delay. On March 8, 2019, the trial court denied Hines' motion for new trial, and this appeal followed.

Though Hines has not asserted that the evidence was insufficient to sustain her convictions, we nonetheless find that the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Hines was guilty of both counts of cruelty to children in the first degree. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. In her first enumeration of error, Hines contends that the trial court erred in allowing the State to introduce evidence of the DFCS investigation of the child's injuries, the child's placement, and the DFCS safety plan. During Hines' trial, the State called as a witness the DFCS investigator assigned to the child's case. The investigator testified that DFCS "did go to court" in this case and explained to the jury that this meant DFCS would present its findings to the judge, including whether

the allegations were substantiated,[2] and the judge would determine the child's placement. The State then introduced the safety plan for the stated purpose of refreshing the investigator's recollection. See OCGA § 24-6-612. The DFCS investigator, who did not prepare or sign the plan, then proceeded to explain the safety plan to the jury, including that "we believed that Ms. Hines caused the injuries so we wanted to place the child with [Irving]. . . . So we asked him to agree not to allow any unsupervised visits [with Hines]." After the DFCS investigator explained and even read from the safety plan, the State attempted to lay a foundation for admitting the safety plan into evidence. During this colloquy, the DFCS investigator again read from the plan:

> [STATE]: And what did [the safety plan] instruct by way of providing a safe environment for the baby?
> [DFCS INVESTIGATOR]: That . . . the child would be placed with Jonathan Irving and that he would — it says protect [the child] from the mother, Nicole Hines; and that he would not allow any [un]supervised visitation with her.

The State then moved to admit the safety plan into evidence, and defense counsel objected on the basis that the DFCS investigator had not prepared the plan. After a

---

[2] The DFCS investigator testified that Hines' story was inconsistent with the child's injuries according to the treating physician, and that this "allowed [DFCS] to substantiate the allegations of abuse."

6

short break, but before the trial court's ruling, defense counsel added an objection to the safety plan based on it being "highly . . . prejudicial." The trial court then apparently admitted the safety plan under the business record exception to the rule against hearsay, see OCGA § 24-8-803 (6), without addressing counsel's objection based on prejudice. The safety plan states that "Child is no longer with maltreater" and includes in its "Steps" that Irving "will protect [the child] from bio-mother Nicole Hines."

Under OCGA § 24-4-403 ("Rule 403"), "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "The primary function of Rule 403, then, is to exclude evidence of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Citation and punctuation omitted.) *State v. Isham*, 348 Ga. App. 356, 360 (823 SE2d 47) (2019). On appeal, "the trial court's rulings on the exclusion or admission of evidence are reviewed for a clear abuse of discretion. Moreover, the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly."

7

(Citations and punctuation omitted.) *Davis v. State*, 301 Ga. 397, 399 (2) (801 SE2d 897) (2017).

> A proper application of the abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach. . . . That said, while the abuse-of-discretion standard presupposes a range of possible conclusions that can be reached by a trial court with regard to a particular evidentiary issue, it does not permit a clear error of judgment or the application of the wrong legal standard.

(Citation and punctuation omitted.) *State v. Jackson*, 351 Ga. App. 675, 677 (832 SE2d 654) (2019).

The State concedes, and we conclude, that the potential for prejudice substantially outweighed any probative value of the safety plan and the accompanying testimony. See *Coleman v. State*, 308 Ga. App. 731, 736 (2) (708 SE2d 638) (2011) (physical precedent only) (DFCS investigator's testimony that the defendant-parents' child "was in foster care for a while" was reversible error because it could have given jury the impression that the defendant-parents were guilty of the crime charged). Here, the safety plan specifically referred to Hines as the "maltreater," which could give the jury the impression that Hines was guilty of the crime charged. Furthermore, the DFCS investigator's testimony regarding the court procedure coupled with evidence that the child had been removed from Hines' custody and that Irving had

been instructed to "protect the child from [Hines]" could lead a jury to conclude that another court or agency already had determined that Hines was guilty. Accordingly, it was error for the trial court to admit evidence of the safety plan and placement of the child, and we cannot say that the admission of this evidence along with the testimony of the DFCS worker was harmless in this case. Accordingly, we reverse Hines' convictions and remand for proceedings consistent with this opinion.

3. Although we reverse and remand in Division 2, we nevertheless address two of Hines' remaining enumerations of error because they involve issues likely to recur on retrial.[3] See *Allaben v. State*, 299 Ga. 253, 257 (3) (787 SE2d 711) (2016).

(a) Hines contends that the trial court erred in allowing the investigating detective to testify to the contents of out-of-court statements made to him by Irving. During the detective's testimony, the following transpired:

> [STATE]: Let's talk about Tuesday. How did you know that the injury happened on Tuesday?
> [DETECTIVE]: That was — that came — that timeline came about after talking to Mr. Jonathan Irving. Mr. Irving indicated to me that that Tuesday morning — early Tuesday morning, he had left for work. He's in the military. Early Tuesday morning he left for work. About — at about noon he returned home to his apartment at which time the first thing he did was check on his son. . . . When he checked on his son at 12:00, he played with him a little while. The child — the child was fine.

---

[3] We do not address Hines' claim of ineffective assistance of trial counsel.

9

He didn't see anything abnormal or unusual about the child. The child was not crying —

[DEFENSE COUNSEL]: Your Honor — Excuse me, Your Honor. I'm going to object to him going into what Mr. Irving said. It's hearsay. Mr. Irving was here. He testified already.

[STATE]: Your Honor, there are multiple exceptions to the hearsay rule and here it's prior inconsistent statements. It's rendered in writing — excuse me — it is recorded and the statement will be played. Also for the affect on [the detective] as he testified previously, he was establishing a timeline and determining what was consistent or not consistent with the injury, so.

[TRIAL COURT]: I'll overrule the objection.

The detective then continued to testify as to what Irving told him happened on the day he discovered the child's injury. Hines contends that the admission of this testimony constitutes reversible error. The State maintains that this testimony did not constitute hearsay because Irving was available and testified at trial.

"An out-of-court statement made by a witness is not hearsay if the witness testifies at the time of trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior consistent statement under OCGA § 24-6-613." (Citation and punctuation omitted.) *Wilson v. State*, 351 Ga. App. 794, 799 (3) (b) (833 SE2d 175) (2019). However, a prior out-of-court statement of a testifying witness may not be used to bolster the credibility of a witness unless that credibility has been attacked. See id; *Blackmon v. State*, 336 Ga. App. 387, 391

10

(2) (a) (785 SE2d 59) (2016) (physical precedent only). In this vein, "[a] party may introduce a prior consistent statement of a forgetful witness where the witness testifies at trial and is subject to cross-examination." (Citations omitted.) *Manning v. State*, 273 Ga. 744 (545 SE2d 914) (2001).[4] See Paul S. Milich, Courtroom Handbook on Georgia Evidence, p. 488 (2019 ed.) ("The fact that a witness testifies to a lack of memory is a form of impeachment."). Here, the record shows that after the 2010 incident, but prior to trial, Irving suffered multiple combat-related injuries, including a head injury. His mother testified that his injuries caused him to have "a hard time remembering a lot of things," and Irving repeatedly had trouble recalling certain details during his testimony, including what occurred on the day he discovered the child's injury. Accordingly, the trial court did not err in admitting the testimony.

(b) Hines next argues that the trial court's admission of the detective's recorded interview with Irving violated her constitutional right to confront Irving. "A Confrontation Clause violation occurs when an out-of-court statement admitted into evidence is testimonial in nature and the declarant is unavailable at trial and was not

---

[4] *Manning* was decided under the old Evidence Code, but the new Evidence Code allows the admission of prior consistent statements if they logically rebut any attack on a witness's credibility, including a charge of faulty memory. See *Walters v. State*, 335 Ga. App. 12, 14-17 (780 SE2d 720) (2015).

11

previously subject to cross-examination." (Punctuation omitted.) *Varner v. State*, 306 Ga. 726, 730 (2) (b) (i) (832 SE2d 792) (2019). Here, the admission of Irving's recorded statement to the detective did not violate the Confrontation Clause because Irving testified at trial and was subject to cross-examination. See *Anderson v. State*, 307 Ga. 79 (2) (b), n.8 (834 SE2d 830) (2019).

(c) Hines asserts that the trial court should have dismissed Count 2 of the indictment for lack of subject matter jurisdiction. Count 2 related to the older fracture to the child's left leg. According to Hines, given the uncertain time frame of when the older fracture occurred and evidence of the child's frequent travel to Alabama, it is uncertain whether the injury occurred in Georgia and thus whether the trial court had jurisdiction over the crime. In other words, Hines argues that the evidence presented at trial failed to prove that the offense charged in Count 2 occurred within the State of Georgia.

Pursuant to OCGA § 17-2-1,

It is the policy of this state to exercise its jurisdiction over crime and persons charged with the commission of crime to the fullest extent allowable under, and consistent with, the Constitution of this state and the Constitution of the United States. . . . Pursuant to this policy, a person shall be subject to prosecution in this state for a crime which he commits, while either within or outside the state, by his own conduct or

12

that of another for which he is legally accountable, if . . . [t]he crime is committed either wholly or partly within the state. . . .

OCGA § 17-2-1 (a), (b) (1). "A crime is committed partly within this state if either the conduct which is an element of the crime or the result which is such an element occurs within the state." OCGA § 17-2-1 (c). Here, Count 2 charged Hines with cruelty to children in the first degree by "maliciously caus[ing the child] . . . physical and mental pain by breaking his left leg. . . ." OCGA § 16-5-70 (b) provides that "[a]ny person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." Thus, the child's physical and mental pain, the result of the conduct, is an element of cruelty to children as defined in OCGA § 16-5-70 (b). And undisputed evidence presented at trial showed that the child was present in Georgia for at least some period of time after suffering the older break. Accordingly, even if the conduct occurred outside of Georgia, the result occurred in Georgia, and Hines' argument is without merit.

4. After Hines' appeal was docketed in this Court, Hines filed a "Motion to Remand," indicating that Hines and the State had come to a "plea agreement" and requesting that we remand the case back to the trial court to reconsider Hines' motion

13

for new trial without considering the merits on appeal. The State then filed a "Motion to Clarify," again asserting that the parties had reached a "mutual resolution" because the State concedes that there is reversible error. The State requested that we not require it to submit a brief on the merits and instead "instantly remand" the case to the trial court without considering the merits of the appeal "in the interest of justice . . . and judicial[ ] efficien[cy]." In light of our disposition in this case, both motions are denied as moot.

*Judgment reversed and case remanded. Barnes, P. J., and Mercier, J., concur.*